## The Orsino.

### Roberts and others *v.* Gill and others.

*(District Court, D. Maryland. March 4, 1885.)*

**Grain Charter-Party—Construction of Words "Now about Ready to Sail in Ballast."**

Merchants in Baltimore, desiring a steamer for an August shipment of grain, signed a charter-party, in which it was stipulated that the steamer was "*now about ready to sail from the United Kingdom, in ballast.*" The steamer at the date of the charter-party, Friday, August 8th, was in the dry-dock at Shields for repairs. She was let out of the dock the next day, and commenced taking in ballast, coal, and stores for the voyage. She completed these preparations on the following Tuesday, when it was discovered that some of her valves had been misplaced while in the dock. This delayed her another day, and she sailed on Wednesday, 13th. She arrived in Baltimore one day too late for an August shipment of grain, and the charterers refused to load her. *Held*, that the steamer was not at the date of the charter-party about ready to sail in ballast, and that the charterers had a right to refuse her.

In Admiralty.

*John H. Thomas* and *G. Leiper Thomas*, for libelants.

*Brown & Brune*, for respondents.

Morris, J. This is a libel against the respondents for refusal to load the British steam-ship Orsino, which the libelants, through their agents, had chartered to the respondents in the city of Baltimore on the eighth day of August, 1884. The charter-party is the usual steam grain charter, and describes the Orsino as "*now about ready to sail from the United Kingdom, in ballast,*" and agrees that the steamer, being tight, staunch, strong, and in every way fitted for the voyage, shall, with all convenient speed, sail and proceed to *Baltimore*. It was provided that should the steamer not be ready for cargo at her loading port on or before the thirty-first of August, the charterers should have the option of canceling; also that they should have the option of loading the steamer at Newport News, order to be given at a port of call.

The circumstances attending the negotiation for the charter of the steamer were as follows: Mr. Crawford, a ship-broker of Baltimore, had been authorized by Messrs. Austin, Baldwin & Co., ship-brokers of New York, and agents for Messrs. Hugh Roberts & Son, of Newcastle-on-Tyne, the owners of the Orsino, to procure a charter for that steamer. Mr. Crawford's final instructions were contained in a telegram from New York, dated August 8th, as follows:

"We repeat offer of Orsino at four, four and a half, cancellation if not ready August 31st. She will probably sail Saturday next."

August 8th was Friday, so that Saturday meant the next day. About noon of August 8th, Crawford approached two of the partners of the firm of Gill & Fisher, who were at the produce exchange, and, handing them this telegram, said, "*Here is an August boat for you.*" Mr. Crawford also stated that the steamer was about ready to sail in ballast. Messrs. Gill & Fisher, after consultation, agreed to take the steamer, and said to Crawford, "Go telegraph at once to Austin, Baldwin & Co., New York, so that the steamer can get right off." Crawford replied, "She is not in the port of London," (which had been mentioned as her home port;) and the reply was, "Wherever she is, hurry her up." On Saturday, the 9th, a charter-party having been prepared and forwarded from New York by Austin, Baldwin & Co., it was presented by Crawford to Gill & Fisher for signature. It contained the words "the steamer is now in the United Kingdom;" but Gill & Fisher refused to sign it, as it did not sufficiently express the position in which the steamer had been represented, and the words, "now about ready to sail from the United Kingdom in ballast," were accepted as satisfactory. The charter-party, so worded, and dated "Baltimore, August 8, 1884," was signed by Gill & Fisher about 4 o'clock P. M. on Saturday, the 9th, and was forwarded to New York, and was there signed by Austin, Baldwin & Co., on behalf of the owners.

In the negotiations nothing had been said about the charterers having the option to load the steamer at Newport News upon giving orders at a port of call. This clause was in the charter-party prepared in New York and tendered to Gill & Fisher, and, as they accepted that clause, it became necessary to name the port of call, and at the signing of the charter-party they named Hampton Roads. It usually takes an hour to transmit a cable dispatch from Baltimore to an English port, and the difference in longitude is about five hours. The owners could not, therefore, have been advised of the port of call until after business hours on Saturday. Just before the charter-party was signed in Baltimore by Gill & Fisher, on the 9th, Crawford received from Austin, Baldwin & Co. a telegram in cipher, of which a translation is as follows:

"NEW YORK, August 9, 1884. *Orsino, where will captain call for orders? She will not sail before Tuesday. North Cambria sailing to-day for Breakwater. Can you induce shipper to allow substitute Cambria for Orsino, as it will give us chance on another boat?*"

Crawford did offer the North Cambria to Gill & Fisher as a substitute for the Orsino, stating that the North Cambria had sailed that day for the Delaware breakwater, but Gill & Fisher declined her as being too large for their purpose.   Mr. Crawford testifies that he thinks he must have communicated at the same time the information contained in the telegram that the Orsino would not sail until Tuesday; but all of the partners of Gill & Fisher to whom the communication could have been made deny that they ever heard of it, and declare that they would not have signed the charter-party if they had been so informed.   I find the fact to be that they were not so informed.

The Orsino did actually sail from the port of Shields on the morning of Wednesday, the 13th, and, having prosecuted the voyage with speed, she arrived at Hampton Roads at 8:30 A. M. on August 29th. Within an hour or two after the ship was at Hampton Roads, the charterers were notified that the Orsino had arrived there and was ready for cargo, and was awaiting their orders where to proceed to load.   Gill & Fisher on the same day replied that they declined to accept the steamer, as she had failed to fulfill the charter; that they had no orders to give, and held themselves released, and refused to load her.   They afterwards more definitely stated the particular in which she had failed to fulfill the charter-party was that she was not at its date "about ready to sail in ballast," and did not sail in fact until the 13th.

The facts with regard to the situation and preparations for sailing which delayed the sailing of the Orsino were as follows:   Prior to the sixth of August, the Orsino had been for 10 weeks lying in the port of Shields, about 12 miles below Newcastle-on-Tyne, moored in the river.   On the eighth of August, when Gill & Fisher agreed to take the steamer, she was in the dry-dock at Shields, having gone into the dock on the evening of Wednesday, the 6th, to have her bottom scraped and painted, her sea-valves overhauled, and some rivets put into her frame and different parts of the vessel, as required by Lloyd's surveyors.   She came out of the dry-dock on Saturday, the 9th, in the morning, and until Tuesday (12th) was lying at Tyne dock, taking in sand ballast, bunker coal, and stores for the voyage. She began to load the sand ballast at 4 P. M. on Saturday, the 9th, and stopped at 8 P. M.   She began again at 7 A. M. on Monday, the 11th, and finished at 7 P. M.   She began to take in coal at midnight of Sunday, the 10th, and finished coaling at noon on Tuesday, (12th.)   She got up steam as soon as she finished coaling, but then it was found that the sea-valves to the water-ballast tanks had been reversed by the machinists who had overhauled them in the dry-dock, and divers had to be sent down to plug the openings in the ship's bottom so that the sea-valves could be properly placed.   This took about 14 hours, and the steamer sailed on Wednesday, the 13th, at about 6 o'clock in the morning.

Gill & Fisher, after signing the charter-party, several times inquired of Crawford to know on what day the steamer had sailed, but he could not inform them. Late in the month of August they got him to telegraph, and then, learning that the steamer had sailed on the 13th, came to the conclusion that she would not arrive in time for an August shipment, and made other arrangements for the grain which they had intended to ship by her. On the eighth of August the rates of vessels for August shipments were higher than for vessels for September shipments, and the rate agreed to be paid for the Orsino was the August rate. On September 1st the best rate which could be obtained for the Orsino was 1s. 10½d. per quarter less than the charter rate, making the loss in freight on the cargo which the ship actually carried out on a recharter £1,067 4s. 4d.

The master, before arriving at Hampton Roads, had thrown overboard all the sand ballast, and had put up the shifting-boards, and at the time the vessel anchored at Hampton Roads she was ready for a grain cargo. It was designed by the captain to use feeders, and they were not quite ready, but could have been made ready in about five hours. But these were not necessary to make the steamer ready for cargo. Feeders are wooden pipes passing through the hatches to the holds of the ship. They are filled with grain, and as fast as the settling of the grain in the holds leaves any vacancy the grain from the feeders runs in and fills up the vacant space, keeping the hold full and solid, and preventing shifting. It is optional, however, with the owners of the vessel whether feeders shall be used, or whether, in lieu thereof, a sufficient quantity of grain shall be put in bags and stowed on the top of the bulk grain. The feeders are less expensive to the ship, and are therefore preferred by the ship-owners, but the marine insurance inspectors do not require feeders if an equivalent amount of stowing in bags is substituted.

I therefore find, notwithstanding the feeders were not completed, that, as the vessel could have been loaded without them, she was, when tendered, ready for cargo. I find that if Gill & Fisher had given orders on the morning of the 29th, when they received notice that the Orsino was at Fortress Monroe, and was ready for cargo, she could have proceeded either to Baltimore or to Newport News in time to have been tendered on the thirtieth of August, but I find that she could not have reached Baltimore in time to have been loaded with grain before the close of the 30th, (Saturday,) which would have been necessary in order to make her cargo an August shipment.

The representation in the charter-party, "*now about ready to sail in ballast*," would seem necessarily to imply that, at the date of the charter-party, the steamer had begun preparations for sailing. In fact, on August 8th, when the contract was made, the steamer was in the dry-dock. She had then, it is true, nearly completed the repairs for which she was put there, and she did come out of the dry-dock on the next day. But it was then that she began her preparations to

sail in ballast. It appears to me, therefore, that it was not true on August 8th that she was then about ready to sail in ballast.

The difference in time between the earliest moment she could have sailed and her actual sailing was not great. The cable dispatch of the afternoon of Saturday, August 9th, naming the port of call, allowing one hour for transmission and five hours for difference of longitude, could not have been received by the managing owners during the business hours of Saturday. But if the steamer had been on Friday, the 8th, "about ready to sail," it was reasonable to expect that she would sail on Monday. She did not sail until Wednesday. This difference of two days made the difference in the port of Baltimore of a September instead of an August vessel. Sailing on the 13th, she could not, being an ordinary freight steamer, be expected to arrive at Fortress Monroe earlier than the 29th, and, arriving at Fortress Monroe on the 29th, she could not be in Baltimore until the 30th, and the 30th being Saturday, and Sunday (31st) not a working-day, she could not complete her loading in August. It was a delay which made a most essential difference to the charterers, and was a delay directly attributable to her not having begun her preparations for sailing until after the date of the charter-party. It was known to the owners' agent, when the contract was made, that what the charterers wanted was an August steamer, and the charterers agreed to pay the increased freight demanded for one. The stipulation as to the steamer's condition with regard to her readiness to sail was therefore a substantive part of the contract; and as in my view of the meaning of the language used that stipulation was broken, it follows that the respondents had a right to refuse to load the steamer, and that the libel must be dismissed.